UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

MOSHE UNGAR,                                          Case No. 15-cv-6091

                                  Plaintiff

-against-

CITY OF NEW YORK, et al

                                  Defendants
_____X


_____
**MEMORANDUM OF LAW IN  OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**
_____



LAW OFFICE OF DAVID ZELMAN

ATTORNEY FOR PLAINTIFF MOSHE UNGAR

709 EASTERN PARKWAY

BROOKLYN NEW YORK 11213

PHONE: 718 604 3072

TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT…..……………..…..……..………………...…….p.2

II.     STANDARD OF REVIEW………………………………………………………….p.2

III.    FACTUAL OVERVIEW…………………………………………………….…p.3

IV.    ARGUMENT………………………………………………………………….…..p.7

A.      PLAINTIFF HAS SUFFICIENTLY DEMONSTRATED THE PERSONAL
        INVOLVEMENT OF THE NAMED DEFENDANTS ……………………….……..p.7

B.      PLAINTIFF'S FAILURE TO PROTECT CLAIM MUST BE DECIDED BY A JURY
        DUE TO FACTUAL DISPUTES……………………………….…………………p.11

C.      PLAINTIFF'S FAILURE TO INTERVENE CLAIM MUST BE DECIDED BY A
        JURY DUE TO FACTUAL DISPUTES…………………………………………..p.15

D.      DEFENDANTS' CLAIM FOR QUALIFIED IMMUNITY FAILS TO TAKE INTO
        ACCOUNT THE FACTUAL DISPUTE IN THIS CASE…………………………p.18

E.      A JURY COULD REASONABLY DETERMINE THAT THE CITY'S FAILURE TO
        PROPERLY MONITOR THE CELL WAS DUE TO A CITY PRACTICE AND WAS
        THEREFORE RESPONSIBLE FOR THE UNSAFE CONDITIONS FACING THE 17
        YEAR OLD PLAINTIFF AT THE TIME OF THE INCIDENT………………...p.20

F.      BECAUSE PLAINTIFF SUSTAINED A SERIOUS INJURY AND DUE TO HIS
        YOUNG AGE AT THE TIME OF THE WITHIN INCIDENT, A DENIAL OF
        MEDICAL CARE ISSUE IS RIPE FOR THE JURY……………….....……………p.23

G.      PLAINTIFF'S NEGLIGENCE CLAIM SHOULD BE SUBMITTED TO THE
        JURY……………………………………………………………………………p.26

V.      CONCLUSION……………………………………………………………………p.27

## PRELIMINARY STATEMENT

Plaintiff Moshe Ungar submits this memorandum of law in opposition to the City defendants' motion for summary judgment pursuant to FRCP 56 as to all of plaintiff's Federal causes of action sounding in failure to intervene, failure to protect and a *Monell* claim.  In addition, City defendants request the Court decline to exercise supplemental jurisdiction of plaintiff's state law claims sounding in negligence and respondeat superior liability.  For the following reasons, the motion should be denied in its entirety.

## STANDARD OF REVIEW

"Summary judgment is a drastic remedy which should be granted only when it is clear that the requirements of Fed. R. Civ. P. 56 have been satisfied."  *United States v. Bosurgi,* 530 F.2d 1105, 1110 (2d Cir. 1976).  Pursuant to Fed. R. Civ. P. 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  In making this determination, the facts must be interpreted in the light most favorable to the non-moving party.  *Id*. at 255 (citation omitted).  As a result, the reviewing court must accept as true the factual statements in the opposing party's affidavits, and draw all permissible inferences in the non-movant's favor. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438 (2d Cir. 1980).  In addition, any factual doubts are resolved in favor of the non-movant.  *American Mfrs.*

*Mutual Ins. Co. v. American Broadcasting-Paramount Theaters, Inc.,* 388 F.2d 272 (2d Cir. 1967).  Recently, the Second Circuit has cautioned lower courts to be careful to construe the facts in the favor of non-moving parties and have issued reversals when District Courts have not adhered to this well-established rule. See *Mitchell v. City of N.Y.*, 841 F.3d 72 (2d Cir. 2016) ("…drawing all inferences in favor of the appellants, as we must, we conclude to the contrary that these facts are insufficient to establish on summary judgment as a matter of law that the officers had probable cause…") See also *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) ( "[D]istrict courts should not engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment." *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003) (reversing summary judgment where the plaintiff offered a competing account of the facts supported by only a single document).

## FACTUAL OVERVIEW

On or about February 28, 2015, at approximately 4:45 p.m., Plaintiff Moshe Ungar was an arrestee inside Kings County Central Booking. (Defense disclosures, hereinafter "Pl. Ex. A," D 21). Plaintiff was seventeen years old. (Pl. Ex. A, D 21). Plaintiff had been arrested for assault and the matter was soon thereafter dismissed. (Pl. Ex. A, D 7). Plaintiff was dressed in Chasidic clothes and noticeably religious. (EBT Ungar, hereinafter "Pl. Ex. B," p. 58 line 1-6). Plaintiff was confined in Female Cell #8. (Pl. Ex. A, D 1). Plaintiff was confined with approximately 15 to 20 inmates. (EBT Defendant Gonzalez, hereinafter Pl. Ex. C, p. 14-15). The maximum capacity of the cell was estimated by defendant at fifteen prisoners, however, there is no official capacity.  (EBT Victoria, hereinafter Pl. Ex. D. p. 36)  Plaintiff was confined to Female Cell #8 for approximately 13-14 hours, but did not learn the names of the other

3

inmates. (Pl. Ex. B, p. 48 lines 7-12).

Brooklyn Central booking is a series of cells in which numerous people await arraignment by a State Court judge.  Eighteen hour stays or more are common in Brooklyn Central Booking cells.  The cells maintain all prisoners waiting for arraignment, from accused murderers and rapists to jay walking infractions or failure to pay a fine. (Pl. Ex. D, p. 40) There is no effort made to segregate prisoners based upon the type of crime they allegedly committed or the age of the prisoner or any other reason other than sex of the prisoner. (Pl. Ex. D, p. 40) Prisoners as young as 16 years old  are housed in Brooklyn Central booking general population. (EBT Defendant Whyte, hereinafter Pl. Ex. E, p.14)  Defendants in this action admitted that Brooklyn Central booking cells are dangerous, so dangerous in fact that guards will not enter the cells unaccompanied by other guards.  (Pl. Ex. E, p. 23-24) (EBT Defendant Urbanek, hereinafter Pl. Ex. F, p. 31)

In this case, Plaintiff was sitting on a bench when another inmate, Luis Marte, launched into an anti-Semitic tirade, complaining about Jewish people having "money" and "nice cars." (Pl. Ex. B, p. 49 lines 19-23). Marte was irate and struck the walls of the cell. (Pl. Ex. B, p. 108 lines 3-15). This went on for approximately ten to fifteen minutes. (Pl. Ex. B, p. 55 lines 1-4). Plaintiff remained sitting on the bench and ignored Marte. (Pl. Ex. B, p. 50 lines 12-14). Guards outside the cell told Marte to "sit down" or words to such effect, but took no other action. (Pl. Ex. B, p. 55 lines 19-24). Plaintiff testified that "a few" guards witnessed Mr. Marte's behavior and comments and gave instructions to Marte to stop his behavior. (Pl. Ex. B, p. 56 lines 10-22 ).  Defendants do not deny that allegation, however, they claim not to recall asking Mr. Marte to discontinue his behavior or sit down or testified they were not present. (Pl. Ex. F, p. 72)  For example, defendant Whyte admits that he may have walked past the cell when

4

plaintiff was in it but simply doesn't recall witnessing anything unusual or the assault that took place. (Pl. Ex. E, p. 25-26) Defendant Gonzalez professes almost a complete lack of memory regarding any aspect of the incident (Pl. Ex. C, p. 36-38) Defendant Victoria testified that he was the cell attendant of the cell plaintiff occupied and that he was in the process of cleaning another cell when he heard about the incident but does not recall where he was when he became aware of the incident at bar. (Pl. Ex. D, p. 25-26) Contrary to defense counsels' argument, plaintiff alleges that several guards witnessed Mr. Marte's behavior and told him to "sit down." (Pl. Ex. B, p. 56). Moreover, plaintiff did not limit the guards who said this as being "black" as counsel claims, rather, plaintiff described one of the guards who witnessed the activity prior to the assault as "black, tall, a little chubby" (Pl. Ex. B, p.101).

Defendant Victoria testified that he and defendant Whyte were the cell attendants assigned to the cell plaintiff was housed in. (Pl. Ex. D, p.11) Victoria further testified that the cell attendants are responsible for both monitoring the cells as well as cleaning other cells which are unoccupied. (Pl. Ex. D, p.12 and p.19) Victoria testified that when he and defendant Whyte were assigned to clean another cell, they were approximately 50 yards away from the cell which plaintiff occupied and that the cell is unmonitored while the cleaning of the other cells takes place. (Pl. Ex. D., p. 46-47) At the time of the within incident, cell attendants were not required to maintain log books of when they monitored a cell, that regulation came about in 2016. (Pl. Ex. D. P. 47) The defendants estimated that fights between inmates occur twice a week. (Pl. Ex. D, p. 33) (Pl. Ex. C, p. 27) The vast majority of fights that occur in Central booking do not result in an arrest. (Pl. Ex. C, p. 27-28) (Pl. Ex. D, p. 33)

Without provocation on the part of plaintiff other than his religious dress and appearance, Marte punched Plaintiff in the face. (Pl. Ex. A, D 1) (Pl. Ex. B, p. 57 lines 7-9).

Plaintiff was knocked unconscious by the punch. (Pl. Ex. B, p. 59 lines 3-4). Other inmates called out and Defendant Gonzalez removed Marte and Plaintiff from the cell. ("Pl. Ex. C," p. 13 lines 9-12)

Plaintiff suffered severe injury to his jaw, lost a tooth and was unable to eat solid food for a period of eleven weeks. (Pl. Ex. B, p. 100 lines 7-25). Plaintiff was prescribed medication but was unable to take it because his injury prevented him from opening his mouth. (Pl. Ex. B, p. 99 line 13 – p. 100 line 15). Plaintiff required multiple oral surgeries. (Pl. Ex. B, p. 81 lines 12-24).

Plaintiff commenced suit on October 21, 2015, and claimed Defendants' failed to protect the infant plaintiff from foreseeable harm in that Defendants failed to intervene in the developing situation and violated Plaintiff's Due Process and Eighth Amendment rights to be free from foreseeable harm. Plaintiff styled his complaint with reference to *Blake v. Kelly*, which is a similar matter involving a prior assault at Kings County Central Booking. (See *Blake v. Kelly*, 2014 U.S. Dist. LEXIS 119090 (S.D.N.Y. 2014)). The Second Circuit has also had the opportunity to address Kings County Central Booking prison conditions in its decision *Darnell v Pineiro*, 849 F3d 17, 20 [2d Cir 2017]) ("The [20] plaintiffs alleged that they were each subjected to appalling conditions of confinement while held pre-arraignment at Brooklyn Central Booking ("BCB") with deliberate indifference to the deprivation of their Fourteenth Amendment due process rights.")

During discovery, it was revealed that defendants maintained a video which preserved this incident in its entirety, including the minutes before and after the incident as the cell was recorded via video camera. Defendants initially claimed to have destroyed the video within 90 days of the incident, however later discovery revealed that to be inaccurate. A second

6

certification was then submitted claiming to have destroyed the video within 30 days of the

incident despite the arrest and prosecution stemming from this incident.  A spoliation motion

was previously decided by your Honor upholding the magistrate's decision that no spoliation

occurred. Defendants were never sanctioned for submitting the false certification to the Court

and counsel.

## ARGUMENT

### A.  PLAINTIFF HAS SUFFICIENTLY DEMONSTRATED THE PERSONAL INVOLVEMENT OF THE NAMED DEFENDANTS

In the context of a prisoner on prisoner assault, the personal involvement requirement is not

an exacting one.  As the Second Circuit has held:

> Thus, what we have meant by using phrases such as "direct participation" as a basis of
> liability is personal participation by one who has knowledge of the facts that rendered the
> conduct illegal. *See Gaston v. Coughlin*, 249 F.3d 156, 165-66 (2d Cir. 2001) (allegation of
> two defendants' "actual knowledge" of prison conditions showed sufficient personal
> involvement to defeat summary judgment); *Snider v. Dylag*, 188 F.3d 51, 55 (2d Cir. 1999)
> (finding personal involvement where prison official issued order of permission for inmates
> to abuse plaintiff, though he was not present during the alleged abuse); *Moffitt*, 950 F.2d at
> 886 (finding that personal involvement "may be premised upon [defendants'] alleged
> knowledge" of the unconstitutional conduct "and a resulting direct participation
> therein");  [**16]  *Meriwether v. Coughlin*, 879 F.2d 1037, 1046 (2d Cir. 1989) (finding
> personal involvement where defendant gave instructions that prisoners be transferred and
> the jury could "infer that he knew" retaliation against plaintiffs would likely result); *Wright
> v. McMann*, 460 F.2d 126, 134-35 (2d Cir. 1972) (affirming damage award based on
> evidence of the defendant's "actual knowledge" of segregation cell conditions). In contrast,
> we have found no liability where the defendant lacked actual knowledge. *See, e.g.*, *Wright*,
> 21 F.3d at 501 (finding no liability where officials lacked notice or knowledge of the alleged
> unconstitutional confinement).
>
> (*Provost v City of Newburgh*, 262 F3d 146, 155 [2d Cir 2001])

In *Ungar*, each of the defendants were initially identified by defense counsel in this litigation

because they were physically present at Kings Central booking at the time of the within assault.

Defendant Victoria admitted to being the cell attendant on the date of the within incident along

with defendant Whyte (Pl. Ex D. p . 12)  Defendant Whyte could not recall if he was the cell

attendant or not but felt that he probably was not because "Because I believe I would know more

than what I know now about the incident because I be watching the cells more directly.  ( Pl. Ex.

E., p. 27, 49)  Defendant Robles was the arresting officer of Mr. Marte and according to

defendant Whyte was also present during the immediate aftermath of the incident, doing an

investigation. (Pl. Ex, E, p. 34-35).  Robles himself could not recall if he was a cell attendant on

the date of the incident or not.  (EBT Defendant Robles, hereinafter Pl. Ex. G, p. 8).  Sergeant

Gonzalez, the ranking officer present remembered pieces of the aftermath of the incident, for

example, speaking to plaintiff, however, he could not recall how he heard about the incident. (Pl.

Ex C, p.14, 18) He recalled walking to the cell where the incident occurred and directing his

officers to remove the plaintiff from the cell, but could not recall which of the officers he

directed to remove plaintiff. (Pl. Ex. C, 16-17)  He could not recall who the cell attendants were.

(Pl. Ex. C, p. 43) Defendant Urbanek worked the control panel on the date of the incident,

buzzing people in and out of various rooms within Central Booking. (Pl. Ex. F, p. 19)  She

recalls hearing a commotion and going to the Female Cell # 8 where the incident occurred. (Pl.

Ex. F, p.29) She recalls being present at the cell, but can not recall which other officers were

present with her. (Pl. Ex. F., p. 30)  She recalled conducting an investigation of the incident and

speaking to the perpetrator. (Pl. Ex. F p. 36)  She could not recall if the plaintiff was in the cell or

out of the cell when she arrived and could not name any other officers who were present. (Pl. Ex.

F., p. 30)  She did recall however that she would not enter the cell alone because that would not

be safe for her.  (Pl. Ex. F., p. 70).

       Defendants Whyte and Victoria, the cell attendants, testified they were assigned to clean

other cells when the incident involving plaintiff occurred.  (Pl. Ex. D., p. 22)  From where the

officers are assigned to clean the other cells, they could not hear what was occurring in Female Cell # 8 . (Pl. Ex. D., p. 29) Defendant Whyte testified he only learned of the incident during its aftermath when plaintiff required treatment. (Pl. Ex. E, p. 37)  Defendant Victoria testified he heard about the incident and resumed his cleaning duties because the incident was already over. (Pl. Ex. D, p. 56-57)

In addition, the cells at Kings Central booking, according to the officers, have no official capacity and the officers are left to use their own judgment as to whether a cell is operated at or over capacity.  (Pl. Ex. F, p. 24-25)  When asked about the capacity of Female cell # 8 where the assault took place, defendant Urbanek testified as follows:

Q:   How many seats, how much seating capacity was there in that cell, Female Cell No. 8, at that time?
A.   Out of --
     MR. MARQUEZ: Objection.
     You can answer.
A.   Out of the three walls in the cell, because, obviously, one is the gate, there is two walls that have benches along the side.
Q.   How many people can sit on those benches comfortably?
     MR. MARQUEZ: Objection.
A.   I don't know about comfortably. I can look -- I said -- you know, I'm Spanish, and we say, if you can feed one person with one plate, you can feed ten.
Q.   Okay.
A.   You probably never heard that saying, but where one can eat, ten can eat. Like I said, there is seats available there. How many can comfortably fit, I don't know.
Q.   If my client said there were people sitting on the floor in that cell, would that surprise you?
A.   No, people do that all the time.
Q.   They do it because there's a lack of space to sit on the bench?
A.   Some people just want to be left alone. They go in the corner.
Q.   Okay.
A.   They sit, they dance, they talk, they mingle. (Pl. Ex. F, p. 81-82)

The defendants depositions were replete with a lack of recall by all of the defendants as to how they became aware of the incident, to who assisted them, to even what they witnessed

9

when they finally observed the cell where plaintiff was housed.  In the context of this prison assault case, nothing more than what is recited above is necessary as far as personal involvement is concerned.  In this case, the plaintiff alleges he was in an overcrowded cell when another inmate began to yell and shout about how jews have money and nice cars and ultimately punched plaintiff, unprovoked by anything plaintiff did or did not do.  Plaintiff alleges he never spoke to the assailant and the assailant just punched him in the face and he was knocked unconscious. Defendants simply deny knowledge of the entire incident prior to the assault.  However, accepting plaintiff's specific testimony that he was detained in a cell and subjected to a long anti Semitic diatribe by a noticeably violent inmate while officers walked by and told Mr. Marte to "sit down", nothing more is needed for the plaintiff to show the personal involvement of the officers who were admittedly assigned as cell attendants on the date of the incident, defendants Whyte and Victoria. See,  (*Fischl v Armitage*, 128 F3d 50, 57 [2d Cir 1997]) ("The record would thus permit a reasonable juror to find either that Marshall opened the cell door for the inmates himself, or that he was in the vicinity of the ongoing attack and, despite Fischl's shouts, knowingly did nothing to stop it. Either would suffice to show Marshall's personal involvement.") However, given the defendants lack of recall as to any aspect of the incident leading up to the assault, no defendant should be determined to be not personally involved at this stage of the litigation.

Plaintiff suffered a fractured jaw as a result and to date has had three surgeries and is still, at the time of writing this opposition, receiving dental treatment directly related to this assault. The issues in this case revolve around whether Female call #8 was monitored adequately, was the cell operating over capacity, were the officers aware that an inmate was acting erratically/violently and shouting anti-Semitic statements while a noticeably religious 17 year old

boy was present in the cell.  Issues of fact remain as to whether the officers were adequately

aware of the cell condition, the overcrowding and the fact that any type of arrestee is housed with

any other type of arrestee, i.e. no effort is made to segregate prisoners on the basis of the crimes

they are accused of.  Ironically, even a lack of "personal involvement" in the context of this case

could tend to convince a jury to impose liability: i.e. where a seventeen year old boy is assaulted

in a cell due to lack of monitoring of the cell or worse, an unwillingness by the officers to enter

the cell as needed due to concerns for their own safety.  (Pl. Ex. F., p. 70)

Lastly, as mentioned above, defendants misconstrue plaintiff's testimony to state that

only black officers told Mr. Marte to sit down prior to the assault.  The testimony does not

support that. (Pl. Ex. B, p. 56)  Plaintiff, however, will concede that defendant Roman Franklin

the Emergency Medical Technician who was assigned to treat plaintiff was not personally

involved in the situation which caused plaintiff to be assaulted and therefore agrees to his lack

of personal involvement in the plaintiff's failure to protect/interevene claims.

B.  PLAINTIFF'S FAILURE TO PROTECT CLAIM MUST BE DECIDED BY A JURY
    DUE TO FACTUAL DISPUTES

Plaintiff alleges a failure to protect cause of action.  As was held in *Ketterman v City of NY*,

2001 US Dist LEXIS 6979, at *15-16 [SDNY May 29, 2001, 00 Civ. 1678 (NRB)]):

> The constitutional rights of pre-trial detainees in the prison safety context under the Due
> Process Clause of the Fourteenth Amendment are at least as great as the protections
> available to convicted prisoners under the Eighth Amendment. *City of Revere v.
> Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 77 L. Ed. 2d 605, 103 S. Ct. 2979 (1983).
> While the precise standard applicable to similar claims under the Fourteenth Amendment
> is unsettled, it is clear that more than mere negligence is required to state a claim. *See,
> e.g., Bryant v. Maffucci*, 923 F.2d 979, 983 (2d Cir. 1991), *cert. denied*, 502 U.S. 849,
> 116 L. Ed. 2d 117, 112 S. Ct. 152 (1991).
>
> Prison officials are "under an obligation to take reasonable measures to guarantee the
> safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27, 82 L. Ed. 2d 393, 104 S.

Ct. 3194 (1984). In particular, prison officials have a duty "'to protect prisoners from violence at the hands of other prisoners.'" *Farmer v. Brennan*, 511 U.S. 825, 833, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994) (citation omitted). In *Farmer*, the Supreme Court made it clear that "being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981)).

In *Ungar*, plaintiff alleges that he was housed in such a fashion that the defendants actually knew that the 17 year old plaintiff who was dressed in religious garb was at a substantial risk of harm and deliberately failed to even monitor the cell as the two cell attendants were out of earshot of the cell, assigned to clean another cell.  No one was assigned to adequately monitor the cell.  The evidence adduced in discovery has established that there were no efforts made to segregate detainees accused of minor offenses from detainees charged with extremely serious offenses; all inmates are bunched together without reference to age or level of seriousness of the crime.  They are kept there for in excess of twelve hours in very close, overcrowded quarters.  Defendant Sergeant Urbanek made it a point at her deposition to describe the cells as unsafe for her and that she would never enter the cell alone.  ( Pl. Ex. F., p. 30-31).  In addition, plaintiff alleges that his attacker spent 10-15 minutes loudly discussing the fact that jews have money, nice cars while banging the walls and acting erratically.  Plaintiff alleges that the officers told Mr. Marte to sit down, but took no action while Marte ranted and acted "violent".  (Pl. Ex. B, p. 105-108).  Defense counsel's allegation of coaching is a desperate attempt to muddy the clear factual record in this case. No officer disputes any aspect of plaintiff's testimony as to what Mr. Marte did or said prior to the actual assault.  While some of the officers testified that they may not have been present as the incident unfolded or don't remember the incident or even deliberately attempted to deny their involvement, the result is the same. A jury is required to determine

exactly what the facts were on February 28, 2015 at Kings County Central Booking, Female Cell # 8.

Courts in analogous contexts have similarly determined that the plaintiff has adequately alleged a failure to protect claim by alleging similar facts such as those now before the Court.  In *Tate v City of NY*, 2017 US Dist LEXIS 222578, at *31-32 [EDNY Sep. 29, 2017, No. 16-CV-1894(KAM)(SMG)] the Court analyzed a failure to protect cause of action in the context of an inmate assault and held:

> Although defendants argue in their instant motion that "the alleged assailants were not identified, indicating that the officers were not on notice that Plaintiff required protection from any particular inmates" (Def. Mot. at 19), the court notes that "the issue is not whether [plaintiff] identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [plaintiff]." *Hayes*, 84 F.3d at 621 (noting that "[a]lthough a prisoner's identification of his enemies is certainly relevant to the question of knowledge, it is not, necessarily, outcome determinative"). Moreover, "the failure to give advance notice is not dispositive," and a plaintiff "may establish [defendant]'s awareness by reliance on any relevant evidence." *Farmer*, 511 U.S. at 848. Similarly, although, as defendants note, "plaintiff sets forth no facts regarding any prior altercation" (Def. Mot. at 18), "an actual attack is not necessary to allege the existence of a substantial risk of serious harm." *Walker v. Shaw*, No. 08-CV-10043, 2010 U.S. Dist. LEXIS 62664, 2010 WL 2541711, at *9 (S.D.N.Y. June 23, 2010) (citations omitted).

Similarly, in (*Scott v Warden & Adm'r of Jurisdiction Corr. Dept. & Med. Dept.*, 2010 US Dist LEXIS 108283, at *16-17 [SDNY Aug. 23, 2010]), the District Court discussed the interplay of the seriousness of the injury in a summary judgment context of a failure to protect cause of action:

> The Defendants do not dispute that Scott's injuries, including two black eyes, and injury to his face, back, and wrist, constituted serious harm. Instead, they argue that C.O. Rebello did not act with deliberate indifference. (Defs.' Mem. at 8). Scott claims in that regard that C.O. Rebello failed to protect him from Haastrup's assault by allowing Haastrup out of his cell and then "disappearing." (SAC at 3). Read liberally, the SAC alleges that C.O. Rebello heard Haastrup threaten Scott and then recklessly released Haastrup from his cell. If C.O. Rebello actually heard the threat and shortly thereafter allowed Haastrup out of his cell, he might have disregarded a substantial risk that Haastrup would injure Scott, which is sufficient to state a federal constitutional claim. Scott therefore has stated a failure-to-protect claim against C.O. Rebello and the Defendants' motion should be denied with respect to this claim. *See Knowles v. New*

*York City Dep't of Corr.*, 904 F. Supp. 217, 221 (S.D.N.Y. 1995) (deliberate indifference established if correction officers had actual knowledge of the risk of a likely prisoner attack but failed to respond reasonably); *Villante v. Vandyke*, No. 9:04-CV-759 (FJS), 2008 U.S. Dist. LEXIS 3408, 2008 WL 163596, at *2-*3 (N.D.N.Y. Jan. 15, 2008) (failure to intervene in prisoner attack constitutes deliberate indifference*); cf. Fernandez v. New York City Dep't of Corr.*, No. 08 Civ. 4294 (KMW), 2010 U.S. Dist. LEXIS 29686, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010) ("Absent clear notice of a risk of harm to the prisoner, '[c]ourts routinely deny deliberate indifference claims based upon surprise attacks.'") (quoting *Zimmerman v. Macomber*, No. 95 Civ. 882 (DAB), 2001 U.S. Dist. LEXIS 12499, 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001)).

Here, while plaintiff never had an opportunity to complain about Mr. Marte's behavior as it occurred during the preceding 10-15 minutes before the actual assault, that does not answer the question as to what the officers were aware of before plaintiff was assaulted. Plaintiff alleges a tirade of anti-Semitic verbiage and violent behavior while the defendants deny knowledge of the entire incident and claim only to have learned what happened after it was over.  No officer denies plaintiffs allegations; they simply claim not to be aware of it.   Despite this, plaintiff alleges that at least two officers told Mr. Marte to sit down and be quiet before the assault, but took no other action. (Pl. Ex. B, p. 56) No officer admits to stating anything to Mr. Marte  or recalls anything during the lead up to the actual assault. This is a clear contest of credibility which is uniquely suited for a jury.

Defense counsel makes much fanfare of the fact that the plaintiff never complained of Mr. Marte's behavior prior to the assault and defense counsel underscores the fact that the plaintiff himself, when asked, did not know what the defendants could have done to avoid the incident.  These arguments are weak, at best, due to plaintiff's age, i.e 17 years old at the time of the incident, his lack of experience being in central booking and the reality that if no one is near the cell, there is no one to complain to. In addition, it is well known that guards of cells are not particularly fond of inmate complaints and have been known to discourage them via various means.  Mr. Ungar was not and is not a "career criminal" or other person with extensive

14

experience of how to defend himself while in custody.  He is simply a religious boy who found himself in an unreasonably dangerous predicament.  Whatever brought Mr. Ungar to Central Booking that night did not warrant the type of injury he sustained.  Moreover, the then infant plaintiff is not required to know what the defendants could have done to protect the plaintiff from obvious harm.  The plaintiff's counsel, however, suggests that the defendants should have monitored the cell more closely by not being assigned to clean another cell when they are assigned as "cell attendants", should not have allowed for cell overcrowding, should have entered the cell rather than make comments and/or demands from outside the cell before the assault and confronted Mr. Marte regarding his statements and behavior, should have segregated an openly hostile, unhinged detainee from a defenseless 17 year old such as plaintiff and should have recognized the warning signs being exhibited by Mr. Marte. Defense counsel also argues that plaintiff was in the cell with Mr. Marte for 13-14 hours before Mr.Marte assaulted plaintiff.  That is actually incorrect, however, the misunderstanding was a result of a miscommunication error between counsel and the plaintiff.  Plaintiff testified he was originally in a cell in which Mr. Marte was not present and was then moved to another cell where Mr. Marte was being held. Plaintiff testified that he was in the first cell for 12 to 13 hours where Mr. Marte was not present.  Plaintiff testified he was in a cell with Mr. Marte for a "couple of hours" before he was assaulted.  (Pl. Ex. B, p. 44, 51-52)

### C.  PLAINTIFF'S FAILURE TO INTERVENE CLAIM MUST BE DECIDED BY A JURY DUE TO FACTUAL DISPUTES

The plaintiff's failure to intervene claim is closely akin to the failure to protect claim and some courts appear to treat them as one cause of action.  A case explaining a failure to intervene claim in the context of a prisoner is *Rosen v City of NY*, 667 F Supp 2d 355, 360 [SDNY 2009]).  Rosen held generally as to plaintiff's failure to intervene claim as follows:

In the context of a failure to intervene claim, "[a]n officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *Baker*, 2009 U.S. Dist. LEXIS 19127, 2009 WL 581608, at \*4 (*citing Stubbs v. Dudley*, 849 F.2d 83, 86-87 (2d Cir. 1988)). Courts divide the deliberate indifference inquiry into two parts, one is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. 1/ (quoting Ingraham v. Wright I 430 U.S. 651, 671 n.40, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977)). Because a pre-trial detainee's constitutional rights are at least as great as those of a prisoner, the Due Process Clause protections afforded to Rosen are coextensive with those afforded by the Eighth Amendment. See *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). objective and the other subjective. *See, e.g., Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To satisfy the objective prong of the inquiry, an inmate must show that the alleged condition was "sufficiently serious," and constituted an "unquestioned and serious [deprivation] of basic human needs" or a denial of the "minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 298-309, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (internal citations and quotation marks omitted); *see also Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002). The subjective prong of the deliberate indifference inquiry requires that the charged official "act with a sufficiently culpable state of mind." *Hathaway*, 37 F. 3d at 66. "The required state of mind. equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.; *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) (internal citation and quotation marks omitted).

In the present case, there is no allegation of a continuous sustained beating of the plaintiff where the defendants stood idly by while watching the plaintiff beaten.  Rather, the claim is that the guards were aware of the risk of serious injury to the client due to the anti-Semitic statements as well as the violent behavior exhibited by Marte prior to the assault.  In addition, the guards refused to take appropriate action and thereby subjected plaintiff to the within assault.  The *Rosen* Court cites to the Second Circuit ruling in *Stubbs v Dudley*, 849 F2d 83, 84 [2d Cir 1988] which explains that the guards can be liable for a failure to intervene claim even if the beating had not yet occurred when the guards refused to take appropriate action.

In *Stubbs*, the plaintiff alleged that he was being chased by 20 inmates while in custody

and ran to two guards and asked for assistance.  Instead of assisting, the guards opened a door, removed themselves from the area plaintiff was in and locked him out thereby exposing him to the people chasing him.  The plaintiff then ran to another set of guards who hid themselves behind a plastic partition.  After no guard offered to protect the plaintiff from his pursuers, he was beaten severely by his pursuers.  He brought suit in the Eastern District of New York and won a jury verdict of $26,000.  The Magistrate Judge who tried the case, granted the defendants judgment notwithstanding the verdict and awarded judgment to the defense reasoning that the guards had not acted maliciously.  The Second Circuit rejected the Magistrate's reasoning that malice was required and held that reckless disregard is the appropriate standard.  See *Stubbs, supra.* at 7-8).  *Stubbs* does therefore support the proposition that an ongoing assault need not exist for the plaintiff to prove a failure to intervene cause of action.   The Second Circuit held in *Stubbs*:

> We are satisfied that the jury, properly charged, could reasonably have found that Dudley, without plausible justification, displayed deliberate indifference in failing to prevent the beating of Stubbs despite having had the opportunity to do so. The evidence supports the conclusion that Dudley had adequate time to assess the serious threat facing Stubbs and a fair opportunity to afford him protection at no risk to himself or the security of the prison but nevertheless callously refused to permit Stubbs to pass with him to safety behind the administration door. This conduct could reasonably be found to be deliberate indifference, "tantamount to a knowing willingness that [the harm] occur." *Whitley v. Albers, supra*, 106 S. Ct. at 1085 (citation omitted).
>
> (*Stubbs v Dudley*, 849 F2d 83, 86-87 [2d Cir 1988])

In *Ungar*, similar factual issues exist as to what the officers were aware of and whether the situation they confronted could have been handled appropriately without risk to the responding officers.  Since in *Ungar*, by all accounts, plaintiff was punched one time by one inmate it appears that there was little to no risk to any of the officers when they eventually did go into the cell and remove the plaintiff.  Plaintiff was unable to testify as to how long it was before

officers came to his aid as he was unconscious following the assault.  (Pl. Ex. B, p. 58-60)
Moreover, defendants offer no theory whatsoever as to how long it took them to respond to this
inmate assault.  Since defendants have failed to allege any time frame, their motion for
summary judgment should be denied.  See, (*Muhmmaud v Murphy*, 2009 US Dist LEXIS
108357, at *27 [D Conn Nov. 19, 2009, No. 3:08-cv-1199 (VLB)])  ("The absence of any
evidence documenting the response time creates a genuine issue of material fact preventing
entry of summary judgment for either party on the failure to protect claim.")

### D.  DEFENDANTS' CLAIM FOR QUALIFIED IMMUNITY FAILS TO TAKE INTO ACCOUNT THE FACTUAL DISPUTE IN THIS CASE

It is axiomatic, that where there is a sharp factual dispute of material facts, qualified
immunity can not be decided at the summary judgment stage.  Here, plaintiff alleges that at
least two officers were aware that Mr. Marte posed a significant risk of harm to the plaintiff in
that they witnessed his anti Semitic statements, saw him acted out physically in the cell by
hitting the walls and yet did nothing other than issue verbal commands which  failed to deter the
attack.  The officers themselves neither admit nor deny those allegations, however, they
generally testified they have no recollection of anything Mr. Marte said or did prior to them
reporting to the cell after the assault.  But if plaintiff's version of events is taken at face value,
as it must be at this stage of this action, issues of material fact exist as to whether the defendants
deliberately disregarded a known serious risk of harm to the plaintiff which was borne out when
Mr. Marte punched plaintiff in the face, fracturing his jaw.  See, (*Bonilla v Brancato*, 2002 US
Dist LEXIS 7961, at *29 [SDNY Apr. 22, 2002, 99 Civ. 10657 (LTS)  "…no reasonably
competent officer would consider it appropriate to place an inmate in the SHU yard with two
other inmates who had been threatening him, and then to stand idle while the inmate is

assaulted. *See Thomas*, 165 F.3d at 143 ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness."). See also, *Villante v Vandyke*, 2008 US Dist LEXIS 3408, at *9 [NDNY Jan. 15, 2008, No. 9:04-CV-759 (FJS/DRH)]) ("In 1986, the Supreme Court clearly established that, when a prison official stands by and watches an inmate attack another inmate, he has violated the constitutional rights of the inmate under attack. *See Davidson v. Cannon,* 474 U.S. 344, 348, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986) (citations omitted). ("Since Plaintiff has raised an issue of fact about whether Defendants stood by and allowed other inmates to attack him, the Court concludes that Defendants are not entitled to qualified immunity on this claim.")  See also, (*Ruggiero v Prack*, 168 F Supp 3d 495, 526 [WDNY 2016]) ("An inmate has a Constitutional right to not be confined in unsanitary conditions and to not be assaulted by another inmate, rights which are clearly established. *Walker*, 717 F.3d at 127; *Farmer*, 511 U.S. at 833-34. (*Farmer v Brennan*, 511 US 825, 828 [1994]) ("Nor may an official escape liability by showing that he knew of the risk but did not think that the complainant was especially likely to be assaulted by the prisoner who committed the act. It does not matter whether the risk came from a particular source or whether a prisoner faced the risk for reasons personal to him or because all prisoners in his situation faced the risk. But prison officials may not be held liable if they prove that they were unaware of even an obvious risk or if they responded reasonably to a known risk, even if the harm ultimately was not averted. Pp. 840-845.")

Here, the gravity of the risk posed by Mr. Marte can not be properly assessed by the Court as it is a purely factual matter.  Defendants' argument that plaintiff can not show that any defendants knowingly disregarded the risk to him is a credibility assessment which this Court can not make.  As argued above, plaintiff testified at least two officers witnessed the actions of

Mr. Marte and failed to take appropriate action.  Given the severity of the situation facing the

religious plaintiff who was 17 years old at the time, this Court can not simply credit the

defendants' testimony that they witnessed nothing over that of the plaintiff's testimony which

offers a more detailed factual rendition.

E.   A JURY COULD REASONABLY DETERMINE THAT THE CITY'S FAILURE TO
PROPERLY MONITOR THE CELL WAS DUE TO A CITY PRACTICE AND WAS
THEREFORE RESPONSIBLE FOR THE UNSAFE CONDITIONS FACING THE 17
YEAR OLD PLAINTIFF AT THE TIME OF THE INCIDENT

It is admitted in this case, that the two cell attendants, defendants Whyte and Victoria, the

officers assigned to monitor the prisoners, were assigned away from the cells containing

prisoners in to perform a cleaning job in another set of cells (Pl. Ex. D p. 54)  The officers

testified that it was their duty to clean another cell which was in another area of Brooklyn

Central booking and that did not allow them to both monitor the cell plaintiff was housed in and

discharge their duties in the other cell. (Pl. Ex. D, p. 48) The cleaning job took between a half

hour to an hour and defendant Whyte admitted at deposition that when the cleaning is

occurring, the cell attendants are "not eyeballing" the prisoners. (Pl. Ex. E., p. 52) Defendant

Victoria admitted at deposition that it is not possible to monitor the cells and clean another cell

at the same time.  (Pl. Ex. D, p. 46)  Defendant Robles' testimony that the within assault

occurred while the cell attendants were cleaning another cell reinforces the theory that the

prisoners remained unmonitored due to the cell attendants not being in a position to both clean

cells and monitor prisoners.  (Pl. Ex. G, p. 46-47)  While defendant Whyte mentioned there are

cameras which could show what is occurring inside the cell and there are other NYPD officers

who happen to be walking in the area, there is no officer specifically assigned to monitor the

cells for that half hour to one hour period.  Defendant Victoria, the other cell attendant admitted

that where he was positioned, cleaning the other cell, he would not be able to hear any commotion occurring in the cell plaintiff was housed in.  (Pl. Ex. D, p. 29)  That is sufficient for a jury to determine that the City's practice of assigning the cell attendants to clean other cells and thereby abandon their post of monitoring the cells is a practice which is the "driving force" in allowing the within incident to occur.  The Second Circuit noted in *Darnell v Pineiro*, 849 F3d 17, 26 [2d Cir 2017], a case in which several issues of Constitutional proportion occurring within Brooklyn Central Booking, such as overcrowding and inmate assaults, the Court remanded the matter to the District Court to consider the plaintiffs' *Monell* claim in light of the Circuit's decision.  In addition, the Circuit Court observed regarding Brooklyn Central Booking "Some plaintiffs testified that officers did not monitor the cells to break up altercations." See also, *McKenna v County of Nassau*, 538 F Supp 737, 740 [EDNY 1982] ("Despite defendant's argument to the contrary, the court is satisfied that the county may be held liable for the assault upon plaintiff by a large number of fellow inmates when that assault was caused by the county's policy of confining many inmates in a single area.")

Two other issues stand out in Ungar as the *driving force* behind Mr. Marte's attack on plaintiff.  First, none of the defendants in this case were able to testify as to any official capacity of the cells which compromise Brooklyn Central Booking.   Sgt. Urbanek, a ranking officer in this litigation, was asked at deposition regarding the capacity of the cells at Brooklyn Central booking:

> Q. Have you ever received any documentation about the capacity of these cells, how many prisoners they can comfortably maintain?
> MR. MARQUEZ: Objection.
> A. No.
> Q. To your knowledge, is there a capacity that's known within the personnel at Brooklyn Central Booking for each cell?
> MR. MARQUEZ: Objection.
> A. I'm sorry, your question again?

Q. Sure. The question is, to your knowledge, is there any number of prisoners that you will stop putting into the cell if you reach a certain number?
MR. MARQUEZ: Objection. You can answer.
A. We kind of use common sense as far as what's safe for the people being lodged therein, kind of eyeballing.
Q. Eyeballing?
A. Mmm-hmm.
Q. Okay. So, its really depends on the judgment of the NYPD officers --
MR. MARQUEZ: Objection.
Q. -- whoever is putting the prisoner in there; is that right?
A. Yes.
Q. You've never seen anything in writing about the capacity?
A. No.
Q. There's no strict rules in Brooklyn Central Courts about how many prisoners you can put in each cell?
MR. MARQUEZ: Objection.
A. No. (Pl. Ex. F, p. 24-25)

No defendants in this litigation testified to have ever seen a document or guideline as to how many prisoners can be safely housed in the cells. The consensus of the testimony was that no matter how many prisoners are presented to Brooklyn Central Booking, room will be made for them. Sgt. Urbanek estimated the size of female cell # 8, the cell plaintiff was housed in at roughly 12 foot wide and 30 feet long. (Pl. Ex. F, p. 26-27) Cell attendant Whyte testified that he could not remember if there were more or less than 30 prisoners in the cell at the time of the assault on plaintiff. (Pl. Ex. E, p. 37-38). Given the defendants inability to specify the capacity of the cells they work with and the number of prisoners housed in each cell, summary judgment is not warranted. Moreover, because the back cells were being cleaned, all of the prisoners were required to be moved from the back cells to other cells, further aggravating the cell capacity issue for the hour it took to clean the rear cells. (Pl. Ex.G, p. 46-48)

Defendants' statistical analysis as to the number of assaults in Brooklyn Central Booking is misleading at best. Defendant Victoria testified that assaults in Brooklyn Central Booking can occur regularly at a rate of approximately two per week. (Pl. Ex. D, p. 33) Only

assaults in which arrests have been made are recorded and there is no recorded data on fights which do not result in arrests. (Pl. Ex. D, p. 52)  Defendant Gonzalez testified that altercations occur within Brooklyn Central booking at a rate of twice a week (Pl. Ex. C, p. 27)  Defendant Gonzalez further explained that arrests are rarely made.  Arrests for conduct within Central Booking occur only at a rate of approximately 3-4 over a 2 year period. (Pl. Ex. C p. 27-28)  In the present case, an arrest happened to have been made, possibly due to the egregious nature of the assault where the plaintiff was completely passive and sitting on a bench when he was punched in the face resulting in a fractured jaw.  However, assaults occur weekly within Brooklyn Central Booking and usually will not result in an arrest.

In sum, the City's practice of assigning cell attendants to clean other cells for approximately an hour thereby preventing their ability to monitor the prisoners combined with the displacement of the prisoners in the cells being cleaned into other cells causing an overcapacity issue is the driving force behind the within assault.  Issues of fact exist as to whether the lack of oversight, monitoring and overcapacity issues caused the within serious injuries to the plaintiff. See, (*Hagerman v County of Macomb*, 2017 US Dist LEXIS 46305, at *9-10 [ED Mich Mar. 29, 2017, No. 15-10952])  ("Hagerman asserts a deliberate indifference claim regarding a inmate's right to be free from violence at the hands of his cellmate. That he was not housed alone and was not continuously monitored are two of the ways in which Ryan Hagerman's right to be free from violence at the hands of his cellmate was allegedly violated."

### F.  BECAUSE PLAINTIFF SUSTAINED A SERIOUS INJURY AND DUE TO HIS YOUNG AGE AT THE TIME OF THE WITHIN INCIDENT, A DENIAL OF MEDICAL CARE ISSUE IS RIPE FOR THE JURY

In this case, it can not be disputed that the plaintiff sustained a very serious injury of a fractured jaw which required several surgeries and is in fact still requiring dental treatment at

the time of this motion.  Defense counsel attempts to minimize this cause of action by arguing

that the 17 year old plaintiff did not think his injuries were serious and therefore the Emergency

Medical Technician, Defendant Franklin, was reasonable in his belief that the plaintiff had a

"swollen lip."  However, a closer reading of the testimony demonstrates that the plaintiff

testified he was unconscious following the assault and thereafter relied upon defendant Franklin

to provide him with adequate medical care and that defendant Franklin completely failed in that

regard.  The plaintiff testified as follows:

> Q:  Please explain what this EMT guy did in terms of medical treatment or questions that he
> asked you.
> A. The officer walked me in, asked him if I would need to go to the hospital. The guy
> responded, he put his hand on it, said it just looks swollen, it doesn't look like you have to go
> to the hospital. And the officer walked me to a different cell.
> Q. Were you conscious at the time in which you saw the EMT technician?
> A. I am not sure if it was a male or female. I was conscious.
> Q. Did you speak and tell them what had just occurred?
> A. I don't remember.
> Q. You don't remember what you told them?
> A. No.
> Q. Did you request any further additional medical attention?
> A. No.
> Q. You didn't make any statements to them?
> A. Not that I remember.
> Q. Were there any other officers inside the room with the other EMT technician or was it just
> you and the EMT technician?
> A. It was me and then the officer walked in. He was there asking the EMT if I have to go to
> the hospital. I don't know if he was there the whole time or a minute, something like that.
> Q. Did you request to go to the hospital?
> A. No.
> Q. Is there any reason why you didn't request to go to a hospital at that time?
> A.  There is no reason. (Pl. Ex. B, p. 63-64)

Defendants argue that because plaintiff did not insist upon going to the hospital, the defendants'

failure or refusal to send plaintiff to a hospital is not actionable. However, the above testimony

suggests that the young plaintiff relied upon the defendants' ability to identify which injuries

require hospitalization and which do not and the defendants failed plaintiff in this regard. As was

24

held in (*Gilliam v Hamula*, 2011 US Dist LEXIS 142431, at \*44-46 [WDNY Dec. 12, 2011, No.

06-CV-6351-CJS-MWP]):

> Here, there is a material factual dispute between VanRensselaer and Plaintiff with regard to
> whether he refused to allow her to examine him. This is not, as VanRensselaer characterizes
> it, simply a disagreement as to the proper treatment, which might amount to medical
> malpractice at worst. On the contrary, if the fact finder determines that Plaintiff's version of
> the event is credible, then this amounted to a complete lack of care, and the risk that
> Plaintiff's serious injuries could have resulted in his death. A nurse would most likely have
> been able to assess the serious nature of Plaintiff's injuries, especially the broken jaw, and
> could have sent him to the hospital hours earlier than he eventually went. Even if the
> damages are speculative, Plaintiff would be entitled to ask the jury for nominal damages. *See
> German v. Broward County Sheriff's Office*, No., 439 Fed. Appx. 867, 2011 U.S. App.
> LEXIS 18245, 2011 WL 3847459 (11th Cir. 2011) (the plaintiff argued he was entitled to
> nominal damages even though the deliberate indifference did not cause injury); *Cummings v.
> Connell*, 402 F.3d 936, 942 (9th Cir. 2005) ("Nominal damages, however, serve a separate
> function. As distinguished from punitive and compensatory damages, nominal damages are
> awarded to vindicate rights, the infringement of which has not caused actual, provable
> injury."). Consequently, the material issue of fact, that is, whether VanRensselaer refused to
> examine Plaintiff, or Plaintiff refused to allow VanRensselaer to examine him, precludes
> summary judgment for VanRensselaer.

In this case, the defendants allege plaintiff refused to go to the hospital and documented that

allegation in the Medical Treatment of Prisoner Form, (Pl. Ex. A, D21).  The plaintiff, as can be

seen above, denies that and testified he simply was advised not to go to the hospital. (Pl. Ex. B,

p. 63-64.  EMT assigned, Roman Franklin, had almost no memory of interacting with the

plaintiff. (EBT Defendant Franklin, hereinafter Pl. Ex. H, p.27-28)  EMT Franklin described his

memory as vague and bare. (PL. Ex. H, p. 21, 31,43) EMT Franklin did not send plaintiff to a

hospital and testified that he was surprised to learn at the deposition that plaintiff sustained a

fractured jaw in the assault. (Pl. Ex. H, p. 34) EMT may have given plaintiff an ice pack,

however, he does not recall it. (Pl. Ex. H, p. 43).  In any event, it is clear from EMT Franklin's

testimony that no x-ray was done, no assessment of the jaw fracture was made and no

hospitalization was recommended or even offered. (PL. Ex. H, p.44-46) According to plaintiff,

the pain commenced approximately one to two hours after the assault. (PL. Ex. B, p. 99) The

plaintiff was diagnosed with a fractured jaw the following morning and had surgery on his jaw the following evening. (Pl. Ex. B, p.79) Therefore, the serious medical condition plaintiff sustained at Brooklyn Central Booking was completely ignored by EMT Franklin.  This delay caused plaintiff hours of excruciating pain and delayed the initial diagnosis and the surgery which was performed within hours of the initial diagnosis.

Given the complete lack of medical care, the very serious medical situation the infant plaintiff sustained in the form of fractured jaw requiring surgery and the severe pain the delay in treatment caused, a denial of medical treatment claim must be submitted to the jury.  *Cuffee v City of NY*, 2017 US Dist LEXIS 31604, at *17 [SDNY Mar. 3, 2017, No. 15cv8916 (PGG) (DF)])  ("For claims arising under the 14th Amendment, on the other hand, the Second Circuit has determined that, in light of *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015), "the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively." *Darnell*, 2017 U.S. App. LEXIS 2911, 2017 WL 676521, at *14. Under this standard, a pretrial detainee need only show that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* In other words, "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*

G.  <u>PLAINTIFF'S NEGLIGENCE CLAIM SHOULD BE SUBMITTED TO THE JURY</u>

Defendants request that the Court either dismiss plaintiff's negligence claim or decline to exercise jurisdiction over it.  It is important to note that the plaintiff was seventeen years old at

the time of the within incident.  Under New York law, the plaintiff's young age created a

heightened duty of care for the infant plaintiff.  See, (*N.G. ex rel. S.C. v Connecticut*, 382 F3d

225, 232 [2d Cir 2004]) ("Where the state is exercising some legitimate custodial authority over

children, its responsibility to act in the place of parents (*in loco parentis*) obliges it to take

special care to protect those in its charge, and that protection must be concerned with dangers

from others and self-inflicted harm. "  In this case, there is no evidence that the defendants took

any special precautions at all with respect to the seventeen year old plaintiff and simply treated

him as any other inmate.  A jury could reasonably determine that this was a breach of the

special duty of care for infant plaintiffs which resulted in the serious harm sustained by the

plaintiff.  In addition, plaintiff is permitted to plead both Constitutional violations as well as

negligence claims. (*Brown v City of NY*, 2005 US Dist LEXIS 5512, at *12-13 [EDNY Mar. 30,

2005, No. 02 CV 6337 (NG) (LB)])  ("Defendants argue that plaintiff's negligence claim should

be dismissed because it is inconsistent with plaintiff's Eighth Amendment claim, which requires

plaintiff to demonstrate that defendants acted with deliberate indifference and not mere

negligence. While it is true that the same factual predicate cannot support both a finding of

liability based on reckless or intentional conduct and a finding of liability based on negligent

conduct, plaintiff is free to plead alternate theories of liability, even if those theories are

inconsistent. Such pleading is expressly authorized by the Federal Rules of Civil Procedure.

Fed. R. Civ. P. 8(e)(2); *Kruse v. Wells Fargo Home Mortgage, Inc.,* 383 F.3d 49, 55 n.3 (2d Cir.

2004)

## **CONCLUSION**

Wherefore, plaintiff respectfully requests that this Court  deny defendants motion in its

entirety and for any and all relief deemed appropriate and just by this Court.

Dated: Brooklyn, New York
      March 14, 2019

                    Respectfully Submitted,

                    **LAW OFFICE OF DAVID A. ZELMAN**

                            /S

                    _____

                    By:    David A. Zelman, Esq.

                            709 Eastern Parkway

                            Brooklyn, NY 11213

CC: Jorge Marquez, Esq. (Via ECF)

28